## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

PRIME WHOLESALERS, INC.,

      **Plaintiff,**

      **v.**

FIELDS MOTORCARS OF FLORIDA, INC.,

      **Defendant.**

**Civil No. 08-1640 (ADC)**

## OPINION AND ORDER

Plaintiff, Prime Wholesalers, Inc. ("Prime"), filed this action against defendant, Fields Motorcars of Florida, Inc. ("Fields"), alleging that Fields violated the Puerto Rico Dealer's Act, Law No. 75 of June 24, 1964, 10 L.P.R.A. § 278, *et seq.* ("Law 75"), by breaching a distribution agreement allegedly in place between Prime and Fields.  Presently before the court is Prime's motion requesting a preliminary injunction (**Docket No. 3**) and memorandum in support thereof (**Docket Nos. 4, 88**).[1]  Fields has opposed said motion. **Docket Nos. 16, 89**.  After reviewing Prime's request, the evidence on record, and the testimony presented during the four day preliminary injunction hearing (the "hearing"), the court **DENIES** Prime's request for injunctive relief.

---

[1] Prime seeks an order from the court compelling Fields to (1) continue to distribute its product line through Prime, (2) tender the four missing vehicle titles and (3) tender one-hundred and eighty thousand dollars. **Docket No. 1**. This opinion and order will deal exclusively with Prime's first request regarding the distribution of Fields' vehicles, as it previously issued an order regarding the four titles (**Docket No. XX**), and finds that the third request for damages does not warrant injunctive relief. *See, e.g., Morales v. Trans World Airlines, Inc.,* 504 U.S. 374 (1992) (explaining that courts of equity should not act when moving party has adequate remedy at law and will not suffer irreparable injury if denied equitable relief).

## I.    Relevant Factual Averments of Each Party

Due to the complexity of the factual averments put forth by the parties, coupled with the size of the record, the court will refrain from putting forth an exhaustive narrative of facts, but will instead limit its discussion to factual averments relevant to the issue at bar.

### A.    Prime's Relevant Testimony and Documentation[2]

#### 1.    Prior Dealings Between Soltero and Fields

▸    Beginning in 1991 or 1992, Manuel Soltero's prior company, Euromotion, Inc. ("Euromotion"), began purchasing BMWs in Florida and reselling them in Puerto Rico. *See* Exhibit 1 (*Euromotion, Inc. v. BMW of North America, Inc.*, Civil No. 96-1771 (PG) (D.P.R. 1996)). Euromotion purchased BMWs from different BMW of North America, Inc. ("BMW NA") dealers in Florida, but mostly from Fields. *Id.* During this time, Manuel Soltero (Soltero) worked closely with Carlos Kirigin ("Kirigin"), principal sales representative for Fields. *Euromotion, Inc. v. BMW of North America, Inc.*, 136 F.3d 866, 869 (1st Cir. 1998).

▸    In 1993, Euromotion applied to become BMW NA's authorized dealer in Puerto Rico. *Id.* On June 22, 1995, BMW NA announced that it had chosen Autogermana to serve as its exclusive dealer in Puerto Rico. *Id.*

▸    On June 25, 1996, Euromotion filed a request for a preliminary injunction under Law 75, against BMW NA. Euromotion's request, and its claim were dismissed. Exhibit 1. As a result, Euromotion ceased operation because "BMW didn't allow [Soltero] to represent them any more in Puerto Rico to sell their automobiles or use their trademarks. . . ." **Docket 68**, at 11; *see also* **Docket No. 72**, at 71 ("Q. Now, do you know if back when you were litigating against BMW [NA], BMW [NA] sent to you a letter telling you that you cannot use BMW trademark? A: Yes.").

#### 2.    Prime's Relationship With Fields

▸    After Euromotion ceased operations, Soltero continued selling vehicles in Puerto Rico through Prime, a corporation that was organized in 1993 under the

---

[2] Unless otherwise noted, the following "facts" are gathered from the record and the testimony of Manuel Soltero ("Soltero"), President of Prime.

laws of Puerto Rico.  **Docket 68,** at 12.    In 1995, Prime sold all car models at discount prices.  In 1996, after negotiations with Fields it began to sell or distribute BMWs in Puerto Rico.

▸    According to Soltero, in September of 1996, he met John Mantione ("Mantione"), the general manager of Fields.  *Id.* at 18.  During said meeting, the two allegedly discussed Soltero's distribution plans for BMWs in Puerto Rico.  *Id.*[3]  Reportedly, Mantione agreed to respond to Soltero's business proposal upon contacting and consulting with BMW, NA.

▸    After this alleged initial conversation, Soltero testified that he received a call from Kirigin, who told him that in order for Fields and Prime to begin a relationship, Soltero needed to open a bank account in the name of Caribe Trading.  *Id.* at 22.  Soltero created said account.  **Docket No. 72,** at 10.  Soltero admitted that the Caribe Trading account was created to hide the Prime name from BMW NA.  *Id.* at 11.

▸    According to Soltero, there were no limitations on Prime's ability to purchase BMW vehicles, from Fields, except that the Prime name was not to be used inasmuch as the Prime name was linked to the Euromotion litigation.  **Docket No. 68,** at 24.  The terms and conditions for the pricing and sales of vehicles were similar to the existing ones between Fields and Euromotion.

▸    At all times, Prime's only contact at Fields was Kirigin.  *Id.*

▸    Prime sold between thirty and forty vehicles a month, ninety-percent of which came from Fields.  *Id.* at 17.

▸    Prime expended a substantial sum of money to build its dealership and create distribution channels in Puerto Rico.  **Docket No. 70**, at 55.

▸    Per Soltero's testimony, starting in 2001, Kirigin began visiting Puerto Rico

---

[3] The record is somewhat unclear as to where Soltero had this conversation with Mantione; he testified at one point that the discussion took place during a golf tournament (*id.*), and later that he met with Mantione at Fields' physical plant in Florida (*id.* at 21).  This discrepancy is of little importance to the ultimate issue.

twice a month. **Docket No. 68**, at 73.[4]  During said visits, Kirigin would pick up copies of the drivers licences of end-users who purchased Fields' vehicles from Prime, as well as data regarding the vehicles registration. *Id.* at 82.  This information was gathered so that Fields could "dupe" BMW NA into believing that Fields was selling vehicles to end-users in Puerto Rico, not brokers. *Id.* at 85, 90; *see also* Exhibit 11 (BMW NA's Expert Sales Activity report outlining limitation on dealers ability to sell vehicles to brokers and dealers).

▸     Soltero testified that he knew Fields was hiding from BMW NA the fact that it was selling vehicles to Prime. **Docket No. 68**, at 93, 94; **Docket No. 72**, at 20. Moreover, Soltero assisted Fields' effort to convince BMW NA that it was selling new BMWs to end-users. **Docket No. 70**, at 2; **Docket No. 72**, at 12.

▸     Soltero testified that he was aware of Fields' scheme to mislead BMW NA from the start of their business relationship. **Docket No. 72**, at 13.  The scheme allegedly lasted throughout the parties relationship. *Id.*

### 3.     Payment History and Receipt of Vehicles

▸     Soltero testified that he routinely issued checks payable to dealers such as Fields, KMT, KMMT, Lord Enterprises, Exclusive Auto, Seacar Consulting and Taddei Auto Sales ("Taddei"), to pay for vehicles ordered from Fields. **Docket No. 68**, at 45. According to Soltero, each check was issued pursuant to instructions provided by Kirigin. *Id.* at 59, 94.

▸     Soltero claims that every car ordered by Prime was delivered, except for the five European vehicles that are the subject of the instant suit. *Id.* at 44. Moreover, titles to all vehicles purchased by Prime were delivered, except for the four in question in the instant action. *Id.*; **Docket No. 70**, at 43.

▸     Notwithstanding this testimony, Soltero claimed that during 2007, "Prime ordered thirty seven (37) vehicles from Fields for the amount of ONE MILLION SIX HUNDRED AND FORTY ONE THOUSAND SIX HUNDRED AND FIVE DOLLARS ($1,641,605.00). . . .  The thirty seven cars were never

---

[4]  Prior to that, Soltero had been traveling to Fields. *Id.*  In the beginning he was going about once a month, after that about three or four times a year. *Id.*  According to Soltero, during these visits, he saw numerous other Fields' employees, including Mantione, whom he visited at least twice. *Id.* at 76.

received by Prime." **Docket No. 98**, at 3.

### 4.    Shipments of Vehicles to Prime

▸    All vehicles purchased by Prime from Fields were shipped to Puerto Rico via a shipping agent. **Docket No. 68**, at 61, 71; *see also* Exhibit 8.   Prime was responsible for the shipping fees, along with all other fees associated with bringing the vehicles into Puerto Rico. **Docket No. 68**, at 61-62; Exhibit 31, at961 (evidencing Prime's payment for transport of vehicles).   During the entirety of the relationship, Prime was able to order vehicles by telephone or through Kirigin.  Each car delivered by Fields came with a bill of lading made out to Prime. **Docket No. 68**, at 72; *see also* **Docket No. 70**, at 30-32; Exhibit 16. At no point during their business dealings did Prime ever receive a bill of lading[5] made out to an end-user. **Docket No. 68**, at 72.  At all times, between 1996 and 2007, payments were made out of the Caribe Trading account.[6]

### 5.    Fields' Other Distribution Points in Puerto Rico

▸    Soltero admitted and testified that he was one of a number of dealerships selling Fields' vehicles in Puerto Rico.  *Id.* at 88; **Docket No. 72**, at 74-78. Actually, after 2001, the sales of BMW's had increased event that prompted Kirigin to visit Puerto Rico twice a month.[7]

▸    During the time the business relationship between Fields and Prime endured, BMW NA detected and reported to Fields, several times, irregularities consisting of sales within other regions (exportation) and miscellaneous billings

---

[5] A bill of lading is "[a] document acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods." Black's Law Dictionary 176 (8th ed. 2004).

[6] Payments from the same Caribe Trading account were similarly issued to other dealers doing business with Prime (Exhibit 7).

[7] During visits to Prime's facilities, Kirigin used to meet with Soltero to discuss purchases, prices and inventory needs.  Kirigin also used the opportunity to gather and take with him documents and information (ie: copies of driver's licence, registration) relative to the end users who had purchased vehicles at Prime's facilities.  All information so gathered, Fields subsequently provided to BMW NA to evidence sales to end users.  Soltero testified that by doing so, Fields qualified and benefitted from all programs, bonuses and rights he was entitled as distributor for BMW, NA

for vehicles not payed (i.e., those that remained in the showroom). For these irregularities Fields was fined by BMW NA. The documentation obtained by Kirigin was used by Fields to justify sales to end users and later on, challenge the fines imposed by BMW NA. (Productions of documents: 2053, 2054, 2098, 2095, 2097, 2070, 2073, 2075, 2092, 2093, 2100, 2107, 2293, 2295, 2264, 2304, 2309, 2311).

**6.    Problems with Delivery of Vehicles and Titles/MSOs**

‣    Prime began to have problems with Fields in 2007. **Docket No. 70**, at 56. At the end of 2006 and beginning of 2007, Prime encountered problems getting delivery of MSOs.[8] *Id.* In November or December of 2007, Prime's last order of European vehicles was not delivered. *Id.* Fields ceased to deliver vehicles to Prime in 2008. *Id.*

‣    In March of 2008, Soltero traveled to Florida and met with Kirigin to inquire about the missing titles and European vehicles. *Id.* at 57. He was told that everything would work out. *Id.* Soltero did not meet with Mantione at that time.

‣    After discovering that Kirigin had been terminated from employment by Fields, Soltero met with Mantione and Fields' attorney on May 5, 2008. *Id.* at 65. During said meeting, Soltero provided Mantione with a list of twelve titles that were allegedly owed to Prime and the list of five European vehicles that had been paid for but not delivered. *Id.* at 74; Exhibit 25, 26. Prime also provided Fields with copies of the checks that allegedly evidenced payments for the vehicles associated with the missing titles. Exhibit 27.

‣    Mantione turned over eight of the missing titles (Exhibit 28), but refused to surrender the remaining four titles because he had not yet verified that the funds from the four checks made out to Taddei (Exhibit 31, at 961) to pay for said vehicles had ever been received by Fields. **Docket No. 70**, at 78. The issue of the missing European vehicles titles was not resolved. *Id.* at 82-83.

‣    In an attempt to establish it had paid for the four vehicles which titles were missing, Prime obtained from Taddei copies of deposit slips that evidence the

---

[8] An MSO is a manufacturer statement of origin. **Docket No. 81**, at 18.

deposit of checks from Caribe Trading into a Taddei account (Exhibit 31, at 964, 962), and of checks from Taddei to Fields. *Id.* at 83; **Docket No. 83**. The checks, however, contain no vehicle reference information.

▸ A second meeting between Soltero, Mantione and Fields' attorney took place on May 13, 2008, and was equally unsuccessful in settling the parties dispute. **Docket No. 70**, at 127.

**B.     Fields' Relevant Testimony and Documentation**[9]

**1.     Kirigin's Assistant**

▸ Guinard was an assistant to Kirigin from 2000 until 2008**. Docket No. 72**, at 99. During that time, Guinard assisted Kirigin with the sales process, customer service and paperwork. *Id.* at 101. With regards to paperwork, Guinard was involved in writing down the information of customers and also in helping process some of the paperwork from customer information to the sales manager and to the finance manager. *Id.* at 102. As part of this, he reported certain information to BMW NA. *Id.*

▸ Guinard testified that he believed Kirigin was selling vehicles solely to end-users. *Id.* at 103-04. All information available to Guinard was allegedly provided by Kirigin, and always showed that vehicles sold in Puerto Rico were going to end-users. *Id.* at 103.

▸ During this period of time as Kirigin's assistant, Guinard testified that he never spoke to a Prime representative or Soltero. *Id.* at 104.

▸ Guinard testified that the first conversation he had with Soltero was after Kirigin had been terminated in early 2008. *Id.* at 125. It was a telephonic conversation during which Guinard allegedly told Soltero that he knew nothing about the customers in Puerto Rico, and that, per management instructions, he was not supposed to handle anything from Puerto Rico. *Id.* This was followed shortly by an in-person conversation with Soltero. At the time Soltero was visiting Fields' facilities attempting to either meet with Kirigin or obtain titles to some vehicles he had paid for. *Id.* at 126-27. Again, Guinard

---

[9] Unless otherwise noted, the following "facts" are gathered from the record and the testimony of Miguel Guinard ("Guinard"), Patricia Kollmann ("Kollmann"), and Mantione.

told Soltero that he was not allowed to do any business transaction or deal regarding sales to Puerto Rico. *Id.* at 127.

▸     Guinard testified that he never saw a document at Fields with Prime's name on it. *Id.* at 129.

▸     Guinard had never seen one car with two separate titles/MSOs with differing purchaser information, like the ones that appeared in the record. *Id.* at 131-32; Exhibit I-K (titles for the same car with inconsistent information regarding purchasers).

▸     Guinard testified that he played a very small role in Kirigin's Puerto Rico sales. *Id.* at 139-42, 158.

▸     Some of Fields' files did not contain purchaser signatures. *Id.* at 143.

▸     Fields' internal documents are inconsistent as to when, how, and if certain vehicles were paid for. *Id.* at 145-47, 166-67; *see also* Exhibits E, C, 34.

**2.      Fields' Title Clerk**

▸     Patricia Kollmann has been employed as a title clerk at Fields for two and a half years. **Docket No. 81,** at 17. During this time, Kollmann worked with Kirigin on his Puerto Rico deals. *Id.* at 18.

▸     Kollmann testified that when Fields sells vehicles in the continental United States, and Hawaii, Kollmann sends the completed MSO to the Department of Motor Vehicles in the state in which the vehicles were sold. *Id.* at 24-25. But when a vehicle was sold in Puerto Rico under Kirigin's watch, Kollmann provided a blank form of the MSO directly to Kirigin. *Id.*

▸     With regards to the Puerto Rico MSOs, Kollmann testified she would stamp the MSO's with the Fields BMW stamp, sign her name, and notarize it. *Id.* at 29-30. She would not fill in the name of the purchaser because that was Kirigin's job. *Id.* She would then copy the front and the back of the incomplete MSO and place the copy in the deal jacket that was prepared for every car sale or transaction. *Id.* at 30. Notwithstanding Kollmann's testimony, the copy of the incomplete MSO in the deal jacket did not remain incomplete. It appears that someone other Kollmann, later on, filled the MSO by including the purchaser's and vehicle data. *Id.* at 48-49; Exhibit J.

▸ Kollmann would take the white copy of the buyer's order containing the purchaser's data and staple it to the original, incomplete and notarized MSO, and then file it alphabetically according to the name on the buyer's order. The documents were so kept until Kirigin or Guinard picked it up. **Docket No. 81,** at 35-36; *see also id.* at 46. Once she provided Kirigin or Guinard with the blank, notarized MSO, she did nothing more. *Id.* at 37. This testimony which the Court credits, is in direct contradiction with Guinard's testimony that he had nothing to do with the sale of vehicles in Puerto Rico. Rather, it appears that Guinard, while performing as Kirigin's assistant, did have access to the records and MSOs regarding vehicles sold in Puerto Rico. Actually, Kollmann's testimony establishes that only Kirigin and Guinard were authorized to deal with the Puerto Rico sales/purchases.

▸ The above referenced practice was in effect prior to Kollmann's employment at Fields, (that is, for over two years). *Id.* at 42. This practice did not occur and was not followed in regards to vehicles sales to other regions or through other salespersons.

▸ To the best of Kollmann's knowledge and understanding, this was all done under the instruction of Kollmann's supervisor and Mantione. *Id.* at 53.

▸ Kollmann had never heard of Prime or Soltero prior to the instant action. *Id.* at 41.

### 3.     Mantione

▸ Mantione is the General Manager of Fields. *Id.* at 60. As general manager, Mantione is responsible for the day-to-day operations of the dealership. *Id.* at 66.

▸ According to Mantione, the only person with the authority to bind Fields into a dealership agreement is John Fields. *Id.* at 68.

▸ Prior to December 1, 1999, Fields was permitted to sell BMWs to brokers for resale. *Id.* at 78. After that date, it was no longer allowed to do so. *Id.*; Exhibit Q, at 3; Exhibit N, at 3. In anticipation of this change, Mantione met with Kirigin to inform him that he could no longer sell vehicles to brokers but only to end-users. **Docket No. 81,** at 78-79. A violation of said term exposed Fields to possible termination of its distribution agreement with BMW NA. *Id.* at 81;

Exhibit O, at 40; Exhibit Q, at 43-44.

▸ Kirigin was Fields' top sales person for seventeen consecutive years, until terminated from employment. **Docket No. 81,** at 84.

▸ After allegedly instructing Kirigin to stop selling vehicles to brokers in the late 1990's, Mantione testified that he thought Kirigin was only selling to end-users in Puerto Rico. *Id.* at 87, 109. Mantione believed this because this is what Kirigin at all times told him, and this is what the business papers at Fields, allegedly showed. *Id.* at 109.

▸ Prior to 2007, Mantione claims that he was unaware of any transactions where Kirigin was not properly reporting customer information to BMW NA. *Id.* at 86-87.

▸ Nonetheless, Mantione knew that BMW NA had numerous problems with Fields' sales in Puerto Rico throughout the years. *Id.* at 88. BMW NA had sent Fields numerous letters requesting additional information on specific vehicles and visited Fields twice to inquire on and clarify inconsistencies within the reports BMW NA had received regarding sales and volume of sales in Puerto Rico. *Id.; see also id.* at 92-93.

▸ In order to qualify for BMW NA's added value program[10], Fields needed all sales to be to end-users. *Id.* at 88. This program created "fights" between BMW NA and Fields. *Id.* at 89. BMW NA would request documentation and information from Fields proving that its sales were to end-users. *Id.* In response to these requests, Fields would provide copies of business records, including buyers orders, drivers licences or vehicle registrations it allegedly got from the customers. *Id.* at 90; *see also id.* at 95-97; Exhibit 11, at 2408. Later it started using a delivery receipt with the vehicles VIN number with the customer signature on it. **Docket No. 81**, at 90. All of the above information was provided by Kirigin. *Id.*

▸ In the event a vehicle was found to not have been sold to an end-user, Fields would face charge-backs from the added value program. *Id.* at 91.

---

[10] According to Mantione, the added value program "is a bonus structure setup from the manufacturer to the dealer which is based on customer satisfaction scores and other parameters for the dealer to earn bonus money." *Id.* at 88.

▸ In April of 2001, in response to BMW NA's inquiries, Mantione vouched for the credibility of Kirigin, and informed BMW NA that it would be unwise to terminate him as "his relationship with the customer is such that he can sell them Mercedes or Lexus." Exhibit 11, at 2384; *see also* **Docket No. 81**, at 93-94.

▸ While attempting to respond to BMW NA's inquiries, Mantione was unable to verify vehicle registrations provided by Kirigin for Puerto Rican sales allegedly because he could not read Spanish. **Docket No. 81**, at 95.

▸ BMW NA continued to question Fields' sales of vehicles in Puerto Rico into 2007. *Id.* at 97-98. Fields, however, stood by Kirigin and challenged BMW NA inquiries. *Id.* at 99.

▸ Mantione testified that, contrary to Soltero's testimony, the two did not meet until May of 2008. *Id.* at 100-01. As such, he denies ever meeting with, or agreeing to allow Prime to sell vehicles on Fields' behalf. *Id.* at 101.

▸ Mantione claims that the last authorized sale from Fields to Prime took place in June of 1998. *Id.* at 102; *see also id.* at 108.

▸ Problems arose between Kirigin and Fields in the summer of 2007 because Kirigin's receivables (from the sale of vehicles) "grew to an unacceptable level and the time to get paid were extending to times that were unacceptable." *Id.* at 120. The monies due on vehicles delivered grew to over five million dollars. *Id.*

▸ While the problem of outstanding receivables improved slightly after it was initially called into question by Fields, Kirigin eventually fell back into his practice of selling vehicles without up-front payments. *Id.* at 122, 125. Even after Kirigin resumed his prior practice, Fields continued to employ him.

▸ According to Mantione, it was not until early 2008 that he realized that Kirigin was lying about the true purchasers (not end users) of the vehicles he was selling in Puerto Rico. *Id.* at 133-34.

▸ Mantione testified that he did not request that Soltero created the Caribe Trading checking account. *Id.* at 136.

▸ Mantione further testified that he was contacted by Soltero for the first time, after Kirigin was terminated from employment in early 2008 . *Id.* When they

met, Soltero introduced himself and handed Mantione his business card. *Id.* at 138; Exhibit Y. During their meeting, Soltero allegedly informed Mantione that there were missing titles, that he owned Caribe Trading, and admitted that Caribe Trading had been created to disguise the Prime name. **Docket No. 81,** at 139-40. At the conclusion of the meeting, Fields surrendered eight of the twelve requested vehicle titles. *Id.* at 140. The remaining four titles were not turned over. *Id.*

► Under the current agreement between Fields and BMW NA, if Fields was to sell new BMWs to Prime, its distribution agreement with BMW NA would be subject to termination. *Id.* at 146; *see also* Exhibit 11, at 2041.

► Mantione never questioned or had doubts of the large number of vehicles being sold by Kirigin in Puerto Rico, even though he had no show room and only visited Puerto Rico twice a month. Mantione believed, Kirigin's representations that vehicles shipped to Puerto Rico were stored in a small lot near the shipping yard until buyers could take delivery. **Docket No. 81,** at 162-64. While Mantioned did not know who owned the lot, he believed that Kirigin had been allowed to use the same at no charge. *Id*. at 211. However, Mantione had never seen any paperwork related to the lot nor had he visited it. *Id* at 164-165. Mantione never told BMW NA about the lot. *Id.* at 166, 169-71.

► In spite of years of inquiries by BMW NA, Mantione did not visit Puerto Rico to confirm Kirigin's stories until after a significant amount of money went missing. *Id.* at 167-68. Mantione testified he once attempted in November, 2007 to visit Puerto Rico, but for various reasons, including Kirigin's unavailability at the time, he never made it. *Id.* at 211-12. It does not appear that further attempts to visit Puerto Rico and further investigate or learn of Kirigin's dealings were ever made.

► Notwithstanding BMW NA's constant questioning, Fields never asked for copies of the bills of lading to prove vehicles were being shipped to end-users instead of brokers. *Id.* at 172-73.

► Despite BMW NA's constant questioning, Mantione made no independent investigation into Kirigin's sales in Puerto Rico until late 2007, early 2008.

► Mantione did not instruct Kollmann to stop giving Kirigin blank titles. *Id.* at 182, 183. Fields did not institute collection actions against the alleged end-

users who had purchased and had been delivered the unpaid vehicles. *Id.* at 182.

▸     As of February 2008, Mantione and Fields still had not contacted the shipping company, or instituted collection efforts against end-users, even though it was missing five million dollars. *Id.* at 186.

▸     In March of 2008, Fields received payment for five vehicles which had originally been purchased in April of 2007. *Id.* at 189. Mantione believed that these payments came from end-users. *Id.*

▸     Mantione testified not suspecting and having considered a coincidence the fact that Fields received three two thousand dollar partial payments for outstanding vehicles at the end of 2007. *Id.* at 194-95.

▸     Mantione testified that he did not know Kirigin was selling to brokers until after Kirigin was fired and Soltero told Mantione as much. *Id.* at 200.

▸     Fields has accepted payments for sales of vehicles from Taddei in the past. *See generally id.* at 205-06.

## II.    Standard for Preliminary Injunction Under Law 75

Law 75 "governs the business relationship between principals and the locally appointed distributors/dealers for marketing their products. The statute was initially enacted to avoid the inequity of arbitrary termination of distribution relationships once the designated dealer had successfully developed a local market for the principal's products and/or services." *Irvine v. Murad Skin Research Lab., Inc.*, 194 F.3d 313, 317 (1st Cir.1999); *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 870 (1st Cir. 1998). Through its enactment, Puerto Rico sought to safeguard local dealers from indiscriminate termination of their services as soon as they had successfully developed a lucrative business. *See Joglar Painting, Inc. v. Urecoats Indus., Inc.*, No. Civ. 04-1606 (RLA), 2006 WL 940674, * 2 (D.P.R. Apr. 7, 2006). Among other things, Law 75 provides for preliminary relief to keep the dealership

contract in force during the pendency of the litigation.  P.R. Laws Ann. tit. 10, § 278b-1.[11] Prior to determining whether injunctive relief is proper, however, the court must first determine whether the movant is entitled to Law 75 protection, *i.e.*, as a dealer or distributor as defined by the code.  Moreover, under Law 75, the moving party has the burden of showing why the request for preliminary injunction should be granted. *See Freightliner, L.L.C. v. P.R. Truck Sales, Inc.*, 399 F. Supp. 2d 57, 72 (D.P.R. 2005).

In this Circuit, courts use a four-part test to determine the appropriateness of injunctive relief: "1) movant's probability of success on the merits; 2) the likelihood of irreparable harm absent preliminary injunctive relief; 3) a comparison between the harm to the movant if no injunction issues and the harm to the objector if one does issue; and 4) how the granting or denial of an injunction will interact with the public interest." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 8-9 (1st Cir. 2002).  When confronted with Law 75 claims, "courts must examine the interplay between the traditional criteria for injunctive relief and the relevant provisions of [Law 75].  Courts are not required to apply all requirements of a traditional injunction in their analysis of [Law] 75 provisional remedies;

---

[11] It provides the following:

> In any litigation in which there is directly or indirectly involved the termination of a dealer's contract or any act in prejudice of the relation established between the principal or grantor and the dealer, the court may grant, during the time the litigation is pending solution, any provisional remedy or measure of an interdictory nature to do or to desist from doing, ordering any of the parties, or both, to continue, in all its terms, the relation established by the dealer's contract, and/or to abstain from performing any act or any omission in prejudice thereof.  In any case in which the provisional remedy herein provided is requested, the court shall consider the interests of all parties concerned and the purposes of the public policy contained in this chapter.

*Id.*  It bears noting, however, that the Puerto Rico Legislature did not intend to create additional remedies when it included the injunction remedy provision, but was merely making use of resources that are subject to procedural safeguards.  *Aybar v. F. & B. Mfg. Co.*, 498 F. Supp. 1184, 1191-92 (D.P.R. 1980); *see also Luis-Rosario v. Amana Refrigeration, Inc.*, 733 F.2d 172 (1st Cir. 1984).

however, this does not mean that the provisional remedies of [Law] 75 are independent from the provisions of the Rules of Civil Procedure." *Freightliner*, 399 F. Supp. 2d at 72 (citing *Aybar*, 498 F. Supp. at 1190). The Puerto Rico Supreme Court has stated that "courts should apply the equity tests established in the classical injunction case law, tempered for purposes of Act No. 75." *Systema de Puerto Rico, Inc. v. Interface Int., Inc.*, 123 D.P.R. 379 (1989) (official translation). More particularly, the Puerto Rico Supreme Court has determined that

> the following tests must be taken into consideration when determining whether injunctive relief lies: 1) the nature of the damages that might be inflicted on the parties upon granting or denying the injunction; 2) its irreparability or the existence of an adequate remedy at law; 3) the probability that the plaintiff will eventually prevail when the case is decided on the merits; 4) the probability that the action will become moot if the injunction is not granted, and, above all, the possible impact on the public interest of the remedy sought.

*Cobos Liccia v. DeJean Packing, Inc.*, 124 D.P.R. 896 (1989) (official translation).

Accordingly, in order to grant a preliminary injunction under Law 75, the court must weigh the parties' interests and the injunction's effect on statutory policies; the threat of irreparable harm; the existence of just cause; and the overall merits of the case. *See Picker Int'l v. Kodak Caribbean, Ltd.*, 826 F. Supp. 610, 613 (D.P.R. 1993); *Systema de Puerto Rico*, 123 D.P.R. at 387.

## III.   Legal Analysis

### A.   Whether Prime is a Dealer for Purposes of Law 75

Law 75 defines a dealer as a "person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." P.R. Laws Ann. tit 10, § 278(a). The statute expands this definition by defining a "dealer's contract" as a:

> relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico.

*Id.* at § 278(b). The Puerto Rico Supreme Court, however, has restricted the definition of a

dealer to "'an independent entrepreneur who has established a continuing relationship, either fixed or indeterminate, with another principal for the distribution of a product or service. . . geared to create, develop, and coordinate a market and to obtain new clients.'" *Triangle Trading Co. Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 4-5 (1st Cir. 1999) (quoting *Roberco Inc. v. Oxford Indus., Inc.*, 122 D.P.R. 115, 131 (1988)). "From this definition the court derived the following characteristics of a dealership: promotion of the product, keeping an inventory, fixing prices, delivery and billing responsibilities, authority to extend credit, advertising campaigns, assumption of risk, purchasing the product, maintaining facilities, and offering product-related services to clients." *Id.* at 5. "It has been clearly stated in Law 75 jurisprudence that when considering the aforementioned factors, 'not all ha[ve] to be satisfied in order to determine that a plaintiff is a [Law 75] distributor. Instead, a trial court must consider said factors in light of the evidence presented.'" *Madelux Intern., Inc. v. Barama Co. Ltd.*, 364 F. Supp. 2d 68, 72-73 (D.P.R. 2005) (quoting *Re- Ace, Inc. v. Wheeled Coach Indus., Inc.*, 363 F.3d at 56)). It bears noting, however, that Law 75 is to be liberally construed in favor of finding the distribution relationship. *See, e.g., Computec Sys. Corp. v. Gen. Automation, Inc.*, 599 F.Supp. 819, 826 (D.P.R. 1984).

Here, Prime has put forth the following evidence in support of its claim that it is a dealer under Law 75. Namely, that it: (1) has been selling Fields' vehicles in Puerto Rico for the past twelve years; (2) has made capital investments in inventory and equipment in furtherance of its attempt to sell Fields' vehicles in the Puerto Rico market; (3) employed numerous individuals to facilitate said sales; (4) developed and promoted Fields' product line in Puerto Rico; (5) had significant discretion in contract terms, including delivery and making financing arrangements for its customers; (6) was responsible for the acquisition of licenses, permits, and authorizations required by the Puerto Rico Department of Public Transportation under Puerto Rico law; and (7) assumed responsibility for delivery of Fields' product line to purchasers in Puerto Rico. What Prime did not show, however, was that it had any obligation to purchase vehicles from Fields, fill its showroom with Fields' vehicles, or that was prohibited

in anyway from filling its store/customer orders with non-Fields' BMWs.  In fact, as far as this court could tell, Prime could have stopped purchasing vehicles from Fields at anytime, with no negative consequences.  While the court finds this extremely problematic, for purposes of this opinion, the court, recognizing that it has no bearing on the ultimate outcome, will assume *arguendo* (and certainly without so concluding) that Prime qualifies as a dealer under Law 75.

###   B.      Requirements For Injunctive Relief

Under Law 75, the moving party has the burden of showing why the request for a preliminary injunction should be granted.  Courts, however, are cautioned not to be quick to issue preliminary injunctions.  *Systema de Puerto Rico*, 123 D.P.R. at 387.

###       1.      Likelihood of Success on the Merits

Fields contends that Prime has not meet its burden for injunctive relief inasmuch as any distribution agreement allegedly entered into between the parties would have been contrary to established law.  Prime, on the other hand, claims that it has put forth enough evidence to support its contention that a distribution agreement with Fields was in place, that Fields improperly terminated it and that Prime suffered damages. *See Draft-Line Corp. v. Hon Co.*, 781 F. Supp. 841, 844 (D.P.R. 1991) ("A claim for impermissible termination or impairment of a dealership contract under [Law 75] has two essential elements: that the contract existing between the parties was impaired or terminated without just cause and that there were resulting damages. After the plaintiff has shown an impairment or termination of the contract, the defendant may offer the affirmative defense of just cause."). Prime, however, makes no real effort to justify the validity of the alleged distribution agreement.  For the following reasons, the court finds that, at this time, it is unlikely that Prime will succeed on the merits of its claim.

First, as Soltero made clear during his testimony, Autogermana is the sole authorized dealer of BMWs in Puerto Rico, and has been since 1996.  In fact, Soltero, through Euromotion, applied for, and was denied the right to be BMW NA's authorized Puerto Rico dealer. *See, e.g.*, *Euromotion*, 136 F.3d 866.  Consequently, Prime has known that it was not permitted to sell

new BMWs in Puerto Rico since *before* it ever began selling Fields' BMWs.  As such, if this court were to "uphold" or find a dealership agreement in existence between Fields and Prime, and force Fields to continue said relationship, Autogermana's rights as the sole authorized dealer of BMWs in Puerto Rico would be rendered academic.  Moreover, BMW NA, who is the sole dealer of new BMWs throughout the United States, would also have its rights trampled inasmuch as it only permitted *one* dealership to sell its vehicles in Puerto Rico, and that was not Prime.  Second, if this court were to compel Fields to continue to sell BMWs to Prime—in clear violation of Fields' distribution agreement with BMW NA—it would trample on the rights of BMW NA.  BMW NA has repeatedly emphasized in its distribution contracts with Fields that sales of its vehicles to third-party brokers are strictly prohibited.  Moreover, Prime has known about BMW NA's ban on selling to brokers such as itself, since its inception, but entered into the alleged "agreement" with Fields anyways, well knowing that its illicit activities could become known, and its supplier cutoff.  Nonetheless, Prime is asking this court to "force" Fields (and BMW NA)  to continue to provide it with vehicles, regardless of the ramifications that decision would have on other non-parties to this action.

In light of the above, Prime has failed to convince the court that it is likely to succeed on the merits of its claim, and therefore, Prime's request for injunctive relief should fail. *New Comm. Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.") (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).  Nonetheless, the court will *briefly* examine each of the remaining three factors.

## 2.       Irreparable Harm

"[I]irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II Ltd. v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (citing *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004)).  "The burden is on the movant to demonstrate that the denial of preliminary injunctive relief is likely

to cause irreparable harm and such showing must be 'grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.'" *Alina & A Tours, Inc. v. Royal Caribbean Cruises, Ltd.*, No. Civ. 06-1009, 2006 WL 897975, 6 (D.P.R. Mar. 31, 2006) (quoting *ESSO Standard Oil Co. v. Mujica Cotto*, 327 F. Supp. 2d 110, 130-31 (D.P.R. 2004)).

Here, Prime alleges that it will be irreparably harmed because ninety-percent of its business is derived from vehicles purchased from Fields, and it has no other supplier. Further, it claims that it has suffered damages in the form of lost credibility and prestige before its customers, members of the vehicle industry and others. While it is undeniable that Prime will suffer damages in the event the court ultimately determines that a distribution agreement was in place between the parties and that said agreement was unjustly terminated, the court does not believe that a denial of Prime's injunctive request will cause it irreparable harm. The court reaches this conclusion based upon the fact that all of the evidence put forth by Prime shows that any damages suffered are economic (lost sales, profits, etc.) and reputation damages, both of which may be compensated with a monetary award. *See In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction."); *Freightliner*, 399 F. Supp. 2d at 77; *Puerto Rico Conservation Found. v. Larson,* 797 F. Supp. 1066, 1071-72 (D.P.R. 1992). The Court notes that Soltero has previously gone through a similar experience when after judicial proceedings, Euromotion had been prohibited from distributing BMWs in violation of a pre-exiting distributorship agreement with Autogermana de Puerto Rico. As such, Prime has failed to show that it will suffer irreparable harm if an injunction is not issued. *See Matos v. Clinton Sch. Dist.,* 367 F.3d 68, 73 (1st Cir. 2004) (holding that failure to show irreparable harm is sufficient grounds for denying preliminary relief even if the other requirements of the preliminary injunction standard are met).

### 3.        Balance of the Equities

The court must next balance the harm to the movant if the injunction is not issued, versus the harm that would be suffered by the nonmovant if the injunction is issued. *Freightliner*, 399 F. Supp. 2d at 77.  As the court has already determined, Prime will suffer no irreparable harm (other than the loss of sales of BMW vehicles) if injunctive relief is not granted.  *See supra*.  Prime however, may continue to sell other European cars.  Fields, on the other hand, risks having its distribution/dealership agreement with BMW NA terminated if it continues to sell BMWs vehicles to Prime.[12]  Exhibits O and 11.  In the event such action occurred, Fields would lose a hundred plus million dollar business.  **Docket No. 81**, at 147-8.[13] While the evidence seems to suggest that Fields is not an "innocent" party here, the balance of the equities still tilt towards denying Prime's request.

### 4.        The Public Interest

For the reasons set forth above, namely, that the alleged distribution agreement between Fields (through Kirigin as its representative) and Prime was entered into despite Prime's knowledge that it was infringing on another's Law 75 rights, and that Prime, through its owner, Soltero, had specifically been told in the past that it could not distribute BMWs in Puerto Rico, the court finds that the public interest does not support granting Prime's request. To hold otherwise would be to promote and condone Prime's illicit activity, something Prime fails to mention, let alone address, in its papers and Field's willful blindness..

---

[12] Mantione testified that Fields generated in 2007 total sales in the amount of $14,000,000 and that valuation of the BMW franchise is valued in excess of one hundred and forty million dollars.

[13] Prime contends that this argument has no bearing because (1) "Fields compliance with a duly issued preliminary injunction . . . cannot legally constitute grounds for termination of the agreement," (2) that BMW NA has somehow profited from the illicit scheme entered into between Fields and Prime, and therefore is estopped from claiming that the injunction impedes its contract with Fields,  and (3) any attempt by BMW NA to limit sales of its vehicles through brokers to Puerto Rico is a violation of anti-trust laws.  These arguments are without merit.

### C.      Unclean Hands

As the Puerto Rico Supreme Court has made clear, "the equitable nature of this remedy . . . allows [for] the use of classical defenses such as laches, clean hands, and estoppel." *Systema de Puerto Rico*, 123 D.P.R. 379.  The instant action is an example of such a time where injunctive relief should not be granted because of a party's "unclean" hands.

As extensively discussed above, Prime is anything but an innocent party here.  While it would like this court to believe that it is a small local business being taken advantage of by a large national dealer, the court recognizes otherwise.  As was made clear during the hearing, Prime has known since the inception of its alleged agreement with Fields that BMW NA had an exclusive dealership agreement with Autogermana which controlled the Puerto Rico market as it relates to the sales of new BMWs.  In an effort to keep BMW NA in the dark about its dealings, it intentionally set out to disguise its identity, through the creation of a bank account under the name of Caribe Trading.  **Docket No. 72**, at 10; **Docket No. 68**, at 24  Moreover, as early as 1998, Prime was aware that Fields was not permitted to sell vehicles to brokers in Puerto Rico, yet went out of its way to assist Fields' sales staff to make it appear as if all vehicles were sold by Fields directly to end-users.  **Docket No. 72**, at 12-18.  As such, even if the court had found the test above met by Prime, it would deny its request on this ground alone.

While it has little bearing on the ultimate issue, the court is hesitant to criticize the actions of Prime without at least noting that Fields' actions were no less outrageous.  As was evidenced during the hearing, while it is unclear whether Fields was *specifically* aware of Kirigin's actions vis-à-vis sales of vehicles to brokers in Puerto Rico, it did everything within its power to remain happily ignorant of his conduct while benefitting from the extraordinarily high sale volume of vehicles in Puerto Rico.  In fact, it seemed that as long as money kept pouring in, and Kirigin was able to cover his tracks to keep BMW NA in the dark, Fields tacitly approved of Kirigin's sales methods.  For example, while BMW NA was calling for Kirigin's ouster, Fields stood by its golden goose, vouching for his credibility, but never once, as alleged

by Mantione, conducted an investigation into his sales techniques.  Fields also either created or condoned a system whereby Kirigin was allowed to operate outside of the confines set for all other sales personnel (e.g., dealing with blank titles/MSOs, receiving *pre*-notarized, blank documents, running up massive accounts receivable, etc.).  Moreover, even when it became obvious that something was not right, Fields continued to put its blind faith in Kirigin, even as his lies became seemingly unbelievable (e.g., believing that Kirigin had a lot in Puerto Rico that was rent free).  Consequently, while the court will deny Prime's request, it does so in spite of Fields' conduct.

**IV.    Conclusion**

After careful consideration, the court **DENIES** Prime's request for injunctive relief (**Docket No. 3**).

**SO ORDERED.**

At San Juan, Puerto Rico, on this 17th day of August, 2009.


**S/AIDA DELGADO-COLÓN**
**United States District Judge**